## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

*Electronically Filed*

| | | |
|---|---|---|
| **JOSEPH KNIPP** | ) | |
| **807 HOWE RD.** | ) | |
| **BURLINGTON, KY  41005** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **CASE NO. _____** |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GENESIS HEALTHCARE** | ) | **WITH JURY DEMAND** |
| **DBA WOODSPOINT NURSING LLC** | ) | |
| **7300 WOODSPOINT DR.** | ) | |
| **FLORENCE, KY 41042** | ) | |
| **Serve:** | ) | |
| **RICHARD M. PEACE** | ) | |
| **7210 TURFWAY RD. SUITE E** | ) | |
| **FLORENCE, KY 41042** | ) | |
| **Serve** | ) | |
| **CORPORATION SERVICE CO** | ) | |
| **C/O JACKIE SMETANA** | ) | |
| **421 WEST MAIN STREET** | ) | |
| **FRANKFORD, KY 40601** | ) | |
| | ) | |
| **DEFENDANT** | ) | |

## **COMPLAINT**

For his Complaint against Genesis Healthcare, Plaintiff Joseph Knipp alleges and avers as follows:

1.      Throughout the Covid-19 pandemic, Plaintiff Joseph Knipp stood ready, willing, and able to take safety precautions in the workplace as required by Defendant Genesis Healthcare, his past employer, to prevent the spread of Covid-19 and protect his health and the health of those employees with whom he worked and the patients he served. Plaintiff, however,

1

has a religious belief that conflicts with one of his past employer's safety policies: mandatory vaccination. Plaintiff's belief is protected by federal and state law. Thus, this case is not a challenge to the lawfulness of Defendant mandatory vaccine policy, but rather it is a challenge to how the policy's exemption process was utilized by Defendant and an attempt to prevent future unlawful discrimination based on religion and to hold Defendant accountable for the harm Plaintiff has suffered as a result of Defendant's unlawful conduct.

2.     Federal and state law recognize an employee's right to have religious beliefs considered when those beliefs conflict with an employer's policies, and, when possible, to have those beliefs accommodated. Defendant ignored federal and state law and instead applied its own set of rules when it came to evaluating religious accommodations and exemptions to its mandatory Covid-19 vaccination policy. Defendant then wrongfully denied Plaintiff's request by arbitrarily determining that Plaintiff's request for a religious accommodation to the vaccine mandate "has not met the criteria for an exemption from our universal vaccine policy," as stated in a memo provided to Plaintiff titled Religious Exemption denial. **(Exhibit A.)** This was done in violation of Defendant's obligations under Title VII of the Civil Rights Act of 1964 ("Title VII") and Section 344.040 of the Kentucky Revised Statutes.

3.     Defendant's actions left Plaintiff with the impossible choice of either taking the Covid-19 vaccine, at the expense of his religious beliefs, or losing his livelihood.

4.     Under Title VII and Kentucky law, if an employee seeks a religious accommodation, the employer cannot summarily impose employer-preferred workplace rules that abridge an employee's sincerely-held religious beliefs. In order to protect an employee's rights, the employer must engage in a genuine, good-faith dialogue and consideration of proposed accommodations with objective evidence. If the employer chooses to deny employee

accommodations, it must show proof that allowing the accommodations would place an undue burden on the employer. Defendant's behavior was in violation of these laws.

## PARTIES

5.      Plaintiff Joseph Knipp is a resident of Burlington, KY. Plaintiff had been employed by Defendant for over 3 years. Plaintiff has a sincere religious belief that taking a Covid-19 vaccine violates his religious beliefs. Plaintiff requested a religious accommodation from Defendant's universal vaccination policy as described in their press release from August 2, 2021("vaccine mandate/policy"). **(Exhibit B.)**

6.      Defendant is incorporated in the state of Delaware, with its principal place of business at 7300 Woodspoint Dr., Florence, KY 41042. Upon information and belief, actual direction, control, and coordination of Defendant's business occurs in Florence, Kentucky.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331 because the Complaint seeks relief and damages under 42 U.S.C. § 2000e, *et seq.,* and has supplemental jurisdiction over Plaintiff's state law claim arising from the same events and occurrences under K.R.S. § 344.040 pursuant to 42 U.S.C. § 1367.

8.      Venue is proper in this district pursuant to U.S.C. § 1391(b) because the relevant events took place in Florence, Kentucky, which is in the Eastern District of Kentucky and Defendant's principal place of business is located therein.

9.      The Court has personal jurisdiction over Defendant because Defendant resides and conducts business in this judicial circuit.

10.     Plaintiff's claims for attorney's fees and costs are predicated upon Title VII, 42 U.S.C. § 2000e-5, and as allowed under state law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11.     On or about November 30, 2021, Plaintiff timely filed charges of religious discrimination with the Equal Employment Opportunity Commission via a dual filing agreement with the Kentucky Human Rights Commission.

12.     His Notice of Right to Sue was issued on August 26, 2022. **(Exhibit C.)**

13.     This Complaint is being timely filed based on the date Plaintiff received his Notice to Right to Sue.

14.     All administrative prerequisites to the filing of this suit have been met.

## ALLEGATIONS

15.     In March 2020, American life was irreparably changed both by Covid-19 and by various governments and employers' response to it. Covid-19 is a virus that was first detected in Wuhan, China, and eventually made its way to the United States of America, setting off a chain of events that has irretrievably changed the day-to-day life of many, if not most, Americans.

16.     In the spring of 2020, Defendant began implementing procedures for its workforce, including several of the following requirements for its employees: masks, social distancing, temperature checks, Covid-19 testing, and self-quarantine. Upon information and belief, Defendant had substantial success reducing the risk of Covid-19 spread through these efforts.

17.     Despite Defendant's success in controlling the spread of Covid-19 in its workspace, Defendant chose to implement a universal vaccine mandate, based on reasoning

4

unsupported by science, and has improperly implemented its vaccine mandates in violation of Title VII and K.R.S. § 344.040.

18.    Furthermore, Defendant improperly terminated Plaintiff's employment for refusing to comply with one of its safety procedures – mandated vaccination – which has no documented positive results in preventing the transmission of Covid-19 in the workplace, ignores natural immunity, and improperly access risk.

19.    Defendant stated in its Covid-19 Religious Accommodation Request Form (**Exhibit D)** (the exemption/accommodation form): that Plaintiff read and understood the accommodation policy, his religious beliefs were sincerely held, and that the company would attempt to "provide reasonable accommodations that does not (i) create an undue hardship on the Company, (ii) impair workplace safety; or (iii) creates risk to the health and safety of the residents and my coworkers."

20.    The accommodation policy suggested that Plaintiff's exemption request would be properly evaluated, however, that was not the case.

21.    In Defendant's Religious Exemption Denial, they claimed that they wanted to make sure that Plaintiff was not making his decision to not be vaccinated "based on false information." And that his religious exemption request "has not met the criteria for an exemption from our universal vaccine policy." (**Exhibit A.)**

22.    However, the guidance provided by the Equal Employment Opportunity Commission (EEOC) on how to evaluate religious exemption requests require a process to evaluate exemption requests far differently than what Defendant did. In the document "What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws" under section L.2. it states:

> Generally, under Title VII, an employer should proceed on the assumption that a request for religious accommodation is based on sincerely held religious beliefs, practices, or observances. However, if an employer **has an objective basis** for questioning either the religious nature or the sincerity of a particular belief, the employer would be justified in making a limited factual inquiry and seeking additional supporting information.[1] (emphasis added).

Defendant never provided any support on how they determined Plaintiff failed to meet their criteria nor what was required to meet their criteria. However, as noted above, Defendant was required by law to proceed on the assumption that the religious accommodation request was sincere unless there was an objective basis to believe otherwise.

23.    Plaintiff's original religious exemption request clearly stated his sincerely held religious objection to the Covid-19 vaccine. **(Exhibit D.)** However, without an objective basis to ask for additional information, Defendant required he submit additional information via the Follow-Up to Religious Accommodation Request Form ("Follow-Up form").  He did so and it is attached as **Exhibit E**.

24.    The Follow-Up form stated that **"[m]ore information is required to consider your request for accommodation**." And that Plaintiff was required to provide **"[m]ore information about how you avoid similar products/vaccines.**" (Emphasis in original.) *See* **Id**.

25.    There is no objective basis provided by Defendant to support this inquiry. Additionally, this illegal intrusion into Plaintiff's religious beliefs was not a limited inquiry into the religious nature or sincerity of a particular belief. Defendant's inquiry into how Plaintiff deals with other medical products was instead an all too familiar attempt to play "gotcha" with a person who wants nothing more than to maintain his employment while not going against his sincerely held religious beliefs.

---

[1] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L

26.     The additional information provided by Plaintiff does not serve to replace his original religious exemption. Instead, it was Plaintiff's attempt to provide his understanding of the constitutional and legal rights to which his religious and medical exemptions were based.

27.     Defendant never suggested that Plaintiff's sincerity was in question which may have allowed for such probing of his religious beliefs and legal standing. But that is only allowed where there was objective support. No such support was ever provided to Plaintiff.

28.     Plaintiff followed all procedures and provided more than enough information to meet his legal obligations to have his religious accommodation granted.

29.     In spite of all the efforts and information provided by Plaintiff, Defendant wrongfully and improperly denied Plaintiff's request and terminated his employment in violation of state and federal law.

30.     Defendant applied their own religious criteria in evaluating Plaintiff's sincerely held religious beliefs. Plaintiff was informed of the denial of his religious and medical exemption requests via remarkably similarly worded boiler plate documents which establishes Defendant never gave Plaintiff the individual consideration required by law. The conclusory statements that were given, in both denials, was exactly the same except that in denying Plaintiff's medical exemption, Defendant included the clause "in relation to CDC guidance." **(Exhibit F.**)

31.     With Defendant not providing any details as to what criteria Plaintiff was required to adhere to, he was left without the ability to meet said criteria. However, the EEOC guidelines referenced above are clear. The guidelines in section L.2 document how broadly religion is defined and therefore how broadly the protections are to be considered. The guidelines state:

> The definition of "religion" under Title VII protects both traditional and nontraditional religious beliefs, practices, or observances, including

those that may be unfamiliar to employers…The sincerity of an employee's stated religious beliefs, practices, or observances is usually not in dispute. The employee's sincerity in holding a religious belief is "largely a matter of individual credibility." Section 12-I.A.2: Religious Discrimination (credibility and sincerity).[2]

32.     Defendant did not follow those guidelines. Instead substituting their own evaluation of what is a sincerely held religious belief under law. In doing so, they violated the very well-defined religious rights of Plaintiff.

33.     Defendants never claimed that Plaintiff's sincerity was in question leaving the very important question: How did Defendant determine what is required to meet their criteria? One thing is certain; however, it is a vastly different threshold than what is required under law and federal guidelines. This discrepancy in requirements puts Defendant at odds with federal and state law, thereby making Defendant's decision to deny Plaintiff's religious exemption request illegal.

34.     The clearest statement that proves Defendant's actions were in violation of Federal Law is the unambiguous statement from the EEOC guidelines from section K.12 where it states:

> Once an employer is on notice that an employee's sincerely held religious belief, practice, or observance prevents the employee from getting a COVID-19 vaccine, the employer **must** provide a reasonable accommodation unless it would pose an undue hardship." (Emphasis added)

EEOC guidance explains that the definition of religion is broad and protects:

> beliefs, practices, and observances with which the employer may be unfamiliar. Therefore, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief, practice, or observance. *See* Id.

---

[2] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L

8

35.     Defendant failed to meet the above requirements in their declaration that Plaintiff's religious exemption request somehow failed to meet an undefined and significantly different threshold than what is defined in federal law and guidelines.  They did this willfully while trampling the rights guaranteed under Title VII and specifically documented in the EEOC guidelines that are particular to religious exemptions and the Covid-19 vaccine.

36.     Defendant never claimed that providing Plaintiff an accommodation to the Covid-19 vaccine would be an undue burden.

37.     **Exhibit D** states in unambiguous terms his religious objections through the words of an important religious leader to whom Plaintiff had extensive theological discussions with concerning the Covid-19 vaccine.

38.     While Defendant takes issue with Plaintiff's request for a religious accommodation to the Covid-19 vaccine, they completely fail to address Plaintiff's religious objections to the vaccine and how the vaccine is in direct conflict with his religious belief. Defendant failed to show how Plaintiff's beliefs are not sincerely held nor not religious in their denial of Plaintiff's accommodation request. **(Exhibit A.)**

39.     The EEOC guidelines further provide clarity about how to determine what is religious vs. personal/political/philosophical, etc. in Section L.2 when it states:

> Title VII does not protect social, political, or economic views or personal preferences.  Thus, objections to a COVID-19 vaccination requirement that are **purely** based on social, political, or economic views or personal preferences, or any other nonreligious concerns (including about the possible effects of the vaccine), do not qualify as religious beliefs, practices, or observances under Title VII.  However, overlap between a religious and political view does not place it outside the scope of Title VII's religious protections, as long as the view is part of a comprehensive religious belief system and is not simply an **isolated teaching.**

(Emphasis added.)

9

40.    Plaintiff's religious accommodation documents clearly state that his beliefs are not purely non-religious in nature and are in-fact largely religious as his initial request provided. Furthermore, his religious beliefs go beyond an isolated teaching and are an all-encompassing aspect of how he lives his life.

41.    Plaintiff's religious beliefs are his and his alone. Regardless of whether Defendant agrees or not, there is no objective basis to believe they are insincere nor that they are not religious in nature. Defendant never questioned Plaintiff's sincerity and its attempt to twist his words to make them secular fail when taken on the whole and combined with the statements of the religious leader.  Therefore, they must be granted unless an undue burden is objectively shown. Such undue burden claim was never made at the time of Plaintiff's accommodation denial. Defendant should not be allowed to try to claim, after the fact, that its decision was based on a proper undue burden analysis that is required once a prima facie case of religious discrimination is established.

42.    If Defendant is allowed to make an undue burden claim, contrary to how Defendant apparently evaluated Plaintiff's religious accommodation request, current understanding of the Covid-19 vaccine's inability to reduce the spread of Covid-19 must be considered.

**Defendant pivoted from successful and proven Covid-19 mitigation practices and improperly chose mandated vaccination as its sole safety procedure upon which it predicated employment.**

A.    The vaccine mandate is unlawful as enforced.

43.    The Food and Drug Administration (FDA) issued an Emergency Use Authorization (EUA) for the Pfizer-BioNTech vaccine on December 1, 2020 for select populations. One week later a second EUA for the Moderna COVID-19 vaccine was issued. The

10

FDA issued an EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021. On August 23, 2021, the FDA issued full approval for the Pfizer-BioNTech COVID-19 vaccine marketed as Comirnaty. However, it should be noted, that the FDA has admitted the Comirnaty vaccine, which is legally distinct from the Pfizer vaccine that is currently available in the US, was not available when Plaintiff was terminated.

44.    Though the FDA has approved the use of a currently unavailable vaccine for future use, the only vaccines widely available for use in the United States are these three experimental, investigative and unlicensed drugs, all of which were either developed, tested, or produced with the use of fetal cells from aborted fetuses.

45.    Since the rollout of the vaccines, and prior to Plaintiff's termination, more and more data increasingly showed the vaccines do not prevent infection, do not prevent transmission, and do not prevent illness. Indeed, countries with the most aggressive, expansive use of the vaccines have seen record-setting infection rates and continuing high illness rates.

46.    Scientists studying over 4,000 frontline workers found that between December 2020 until April 2021, the effectiveness of the vaccines cratered from 91 percent to 66 percent. This drastic decline occurred before the Delta and Omicron variants became dominant.[3]

47.    Even more alarming, research focusing on the Pfizer vaccine's effectiveness in America shows that from December 14, 2020, until August 8, 2021, the vaccine plummeted in effectiveness, collapsing from 88 percent to 47 percent.[4]

---

[3] Ashely Fowlkes, et al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance – Eight U.S. Locations, December 2020-August 2021,* 70 Morbidity and Mortality Weekly Report (Aug. 27, 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.com.

[4] Sara Y. Tartof, et al., *Six-month Effectiveness of BNT162b2mRNA COVID-19 Vaccine in a Large US Integrated Health System: A Retrospective Cohost Study,* Lancet, 2021 Oct. 16, 398 (10309):1407-16, available at https://pubmed.ncbi.nlm.nih.gov/34619098/.

48.     In addition, governmental authorities have revised their definition of the word "vaccine" itself to continue to label these experimental drugs with novel ingredients "vaccines" because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission. None of which these vaccines can any longer claim credit for such results which reflects the fact there has never been a successful Covid vaccine in history due to the viral evolution.[5]

B.  The vaccine mandate ignores natural immunity.

49.     The National Institutes of Health and other bodies have found that natural immunity to Covid-19 – that is, immunity cause by infection with Covid-19 and recovery – is incredibly strong. Specifically, antibodies against the spike protein of the Covid-19 virus remain in 98 percent of people who have recovered from the virus six to eight months after infection (the outer limit of the study was simply because the study was done on individuals where were six to eight months out of recovery, not because immunity begins to wear off).[6]

50.     Health and Human Services' Assistant Secretary, Dr. Admiral Brett Giroir stated in August 2021, in a nationally televised interview, that "there are still no data to suggest vaccine immunity is better than natural immunity. I think both are highly protective."[7]

51.     The data out of the State of Israel underscores this point. In a paper awaiting peer review, scientists out the State of Israel report that in studying thousands of patients, those whose

---

[5] Katie Carrero, *Why did the CDC change its definition for 'vaccine'? Agency explains more as skeptics lurk,* MIAMI HERALD (Sept. 27, 2021) available at https://wwww.miamiherald.com/news/coronavirus/artcle254111268.html.

[6] NIH, *Lasting immunity found after recovery from COVID-19*, NIH (Jan. 26, 2021), available at https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19.

[7] FOX NEWS, *Admiral Brett Giroir explains natural immunity to COVID-19*, Admiral Brett Giroir (Aug. 13, 2021) available at https://www.youtube.com/watch?v=O641EW4okPs.

only source of immunity was a vaccine (in the case of Israel, the Pfizer vaccine was used) had a 5.96 to 13.06-fold increased risk of a breakthrough infection with the Delta variant of Covid-19 over those whose immunity was natural.[8]

52. Israel is one of the most vaccinated places in the world, with close to 80 percent of the country having been vaccinated. Israel's bout with the Delta variant of Covid-19 has demonstrated that the Pfizer vaccine, once considered the Cadillac of the three Covid-19 vaccines, is only 64 percent effective at preventing symptomatic cases of Covid-19.[9] Moreover, despite Israel's high vaccination rates, Israel is becoming "the world's COVID hotspot."[10]

53. In addition, in a recent study concerning the Omicron variant, scientists found that the variant "can evade immunity from Covid-19 more so than any other previous variants discovered during the course of the pandemic."[11] "Researchers studied over 11,000 Danish households and found that those who had the Omicron variant had a 31 percent chance of a secondary attack rate (SAR), which refers to the probability an infection occurs within a specific group like a household or close contacts."[12] Moreover, the study revealed that "vaccine

---

[8] Sivan Gazit, et al., *Comparing SARS-CoV-2 Natural Immunity to Vaccine -Induced Immunity: Reinfections Versus Breakthrough Infections*, medRvix (Aug. 25, 2021), available at https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf.

[9] Aaron Blake, *Vaccine doubters' strange fixation with Israel*, WASHINGTON POST (Jul. 22, 2021) available at https://www.washingtonpost.com/politics/2021/07/19/vaccine-skeptics-zero-israel-again-some-reasons/.

[10] Conor Boyd, *Israel is not the world's Covid hot spot: Cases sours despite country's trail blazing vaccine roll-out – sparking fears other highly-vaccinated countries will be hit by another wave due to jabs' waning immunity*, DAILY MAIL (Sept. 3, 2021) available at https://dailymail.co.uk/news/article-9951117/Isreal-worlds-covid-hotspot-0-2-population-catching-yesterday.html.

[11] Shirin Ali, New study finds omicron variant better at evading immunity, THE HILL (Jan. 3, 2021) available at https://thehill.com/changing-america/well-being/prevention-cures/588040-new-study-finds-omicron-variant-better-at citing and referencing https://www.medrxiv.org/content/10.1101/2021.12.27.21268278v1.

[12] *Id.*

effectiveness was reduced to around 40 percent against symptoms and to 80 percent against severe disease. . ."[13]

54.    The now well-known study of the effects of natural immunity in the Cleveland Clinic Health System provides yet another example of the real-world superiority of natural immunity to vaccine immunity. That study compared "breakthrough infections" (re-infection after either contracting Covid-19 or taking a vaccine) among employees of the Cleveland Clinic Health System and found that those who were previously infected and unvaccinated, 1359 people, none suffered breakthrough infections. [14]

55.    Another newly published study found that there is "no discernible relationship between percentage of population fully vaccinated and new COVID-19 cases in the last [seven] days."[15] The study found to the contrary that there was a "marginally positive association such that countries with higher percentage of population fully vaccinated have higher COVID-19 cases per [one] million people." [16]That study, which analyzed 68 different countries' vaccination rates and the rate of new Covid-19 cases, specifically referred to Israel, Portugal, and Iceland, each of which is highly vaccinated and which had more cases per one million people than, for example, Vietnam and South Africa, which had around ten percent of their population fully vaccinated.[17]

---

[13] *Id.*

[14]Nabin K. Shrestha, et al., *Necessity of COVID-19 Vaccine in Previously Infected Individuals*, medRxiv (Jun. 19, 2021), available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3.

[15] S.V. Subramanian and Aknil Kumar, Increases in COVID-19 are Unrelated to Levels of Vaccination Across 68 Countries and 2947 Counties in the United States, Eur J Epidemiol 2021 Sep 30:1-4, https://doi.org/10.1007/s10654-021-00808-7.

[16] *Id.*

[17] *See id.*

56.     Several scholarly journals have also weighed in on the superiority of natural immunity to vaccine immunity. [18]Further, those who previously were infected with Covid-19 were at greater risk for bad side effects associated with the vaccine - in such cases, the vaccine might even weaken their pre-existing immunity.[19]

57.     While the vaccines were arguably once effective at preventing serious cases and deaths, they lag far behind natural immunity in preventing symptomatic cases of Covid-19, and, therefore, transmission of Covid-19.

C. The vaccine mandate relies on an improper assumption about the infection-fatality rate and asymptomatic spread.

58.     Covid-19 presents a risk primarily to individuals aged 85 or older[20] and those with comorbidities such as hypertension and diabetes.[21]

59.     The majority of deaths associated with Covid-19 occur in those over the age of 55.[22] Within the most heavily impacted age group (age 85 and up), only 13.3 percent of deaths from February 2020 to February 2021 were attributed to Covid-19.[23]

---

[18]Jackson S. Turner, et al., *SARS-CoV-2 Infection Indicates Long-lived Bone Marrow Plasma Cells in Humans*, Nature, 595, 421-25 (May 24, 2021), available at https://www.nature.com/articles/s41586-021-03647-4.

[19] Carmen Camara, et al., *Differential Effects of the Second SARS-CoV-2 mRNA Vaccine Dose on T Cell Immunity in Naïve and COVID-19 Recovered Individuals*, bioRxiv (Mar. 22, 2021) https://doi.org/10.1101/2021.03.22.436441, available at https://www.biorxiv.org/content/10.1101/2021.03.22.436441v1.

[20] Mayo Clinic, *COVID-19: who's at higher risk of serious symptoms* (Jan. 22, 2022) available at: https://www.mayoclinic.org/diseases-conditions.

[21] Wren Hann, et al., *Comorbidities in SARS-CoV-2 Patients: a Systematic Review and Meta-Analysis*, ASM Journals/mBio/Vol.12, No. 1 (Feb.9, 2021) https://doi.org/10.1128/mBio.03647-20, available at  https://journals.asm.org/doi/10.1128/mbio.03647-20?permantly+true&.

[22] *Id.*

[23] Heritage Foundation, *COVID-19 Deaths by age* (Feb. 17, 2021) available at https://datavisualizations.heritage.org/public-health/covid-19-deaths-by-age/.

60.    One of the most useful measures for calculating the risk of dying from a virus is the infection-fatality rate (IFR). The IFR is calculated by dividing the number of Covid-19 deaths by the number of Covid-19 infections. It attempts to answer the critical question: "If I get sick, what is the chance that I will die?" The Center for Disease Control and Prevention (CDC) estimates the IFR for the bulk of most working-age adults is exceedingly low.[24] For adults under age 50, the CDC's "current-best estimate" is that 500 people will die per 1,000,000 infections nationwide.[25] In other words, for every one million adults infected age 50 or younger, 999,500 of them will survive Covid-19.[26]

61.    Assuming the data regarding Covid-19 infections is accurate, the CDC's numbers show Americans across the board are far more likely to die of something other than Covid-19, which casts considerable doubt on Defendant's assertions that all employees should be vaccinated due to business necessity.[27]

62.    Defendant already employed a very successful method of preventing Covid-19 spread from the symptomatic – self-quarantine. Defendant's vaccine mandate only addresses one risk: asymptomatic lethal spread. The problem with Defendant's mandate is two-fold: first, asymptomatic lethal spread is significantly less of a threat than Defendant seems to assert,[28] and

---

[24] CDC, *COVID-19 Pandemic Panning Scenarios,* Centers for Disease Control and Prevention (Mar. 19, 2021) available at https://www.cdc.gov/oronavirus/2019-ncov/hcp/planning-scenerios.html.

[25] *Id.*

[26] *Id.*

[27] Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male,* NATURE (Aug. 28, 2020) (demonstrating that individuals under 50 face a negligible threat of a severe medical outcome from a coronavirus infection, akin to the types of risk that most people take in everyday life, such as driving a car) available at https://www.nature.com/articles/d41586-020-02483-2.

[28] Michael A. Johansson, et al., *SARS-CoV-2 Transmission from People Without COVID-19 Symptoms,* JAMA Netw. Open, 2021; 4(1):e2035057 (Jan. 7, 2021)

second, testing more effectively, and easily, suffices rather than forced injections of unwanted experimental, potentially life-altering drugs developed in ways that offend Plaintiff's religious beliefs or discriminates against his because of his sincerely held religious beliefs.

63.     Defendant uses the specter of "asymptomatic spread" – the notion that fundamentally healthy people could transmit Covid-19 to others without having any symptoms of Covid-19 – to justify its vaccine mandate. But there is little credible scientific evidence that demonstrates the phenomenon of "asymptomatic spread" poses any meaningful danger to employees or anyone else for that matter. Indeed, it is "very rare" even according to Anthony Fauci, and, at worst, poses a one-in-a-million risk of lethal spread. Defendant's response to Covid-19 is predicated, in part, on the flawed assumption that asymptomatic individuals pose a meaningful risk of spreading disease.

64.      Evidence of transmission requires that an individual can be shown to be the source of infection for another person who then developed symptoms of a disease/illness.

65.     Basic microbiology shows that infectiousness or transmission of viruses such as Covid-19 require an active infection resulting in elevated levels of viral replication in the host and shedding of the virus.[29]

---

http://doi.10.1001/Jamanetworkopen.202.35057, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707. *See also* Kenneth McIntosh, et al., *COVID-19: Epidemiology, Virology, and Prevention,* WoltersKluner (Jan. 13, 2022) available at https://www.uptodate.com/contents/covid-19-epidemiology-virology-and-prevention#H3392906512.

[29] *See generally*, Samuel Baron, et al., *Medical Microbiology* (4th ed. 1996) available at: https://www.ncbi.nlm.nih.gov/books/NBK8149/. *See also* Hitoshi Kawasuji, et al., *Transmissibility of COVID-19 depends on the viral load around onset in adult and symptomatic patients*, PLOS ONE (Dec. 9, 2020) available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0243597.

66.     Decades of research demonstrates that symptomatic people, such as those coughing, sneezing, and wheezing, are the real drivers of viral spread, a fact Dr. Anthony Fauci initially acknowledged during the early days of the pandemic when he told the press, "[E]ven if there is some asymptomatic transmission, in all the history of respiratory-born viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver is always a symptomatic person."[30]

67.     When the viral replication process is blocked by a healthy immune system, the virus is neutralized, preventing significant viral replication and shedding. This occurs in approximately half the people exposed to the virus. Their immune system's defenses effectively ward off Covid-19 before it can take hold and cause symptomatic disease. Research demonstrated that asymptomatic people are not the drivers of Covid-19 transmission as demonstrated in the following points.

68.     Researchers studying real-world laboratory samples of more than a quarter-million people found that even with a positive RT-PCR test, asymptomatic people have a much lower probability of being infectious.[31]

69.     A research article published in the CDC's *Emerging Infectious Diseases* journal notes that little to no transmission of Covid-19 occurred from asymptomatic people studied by

---

[30] U.S. Department of Health and Human Services, *Update on the New Coronavirus Outbreak First Identified in Wuhan, China*, Press Briefing (Jan. 28, 2020) available at https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2642s

[31] Andreas Stang, *The performance of the SARS-CoV-2-RT-PCR test as a tool for detecting SARS-CoV-2 infection in the population* (Aug. 2021) 83 J. Infect. 2, https://doi:10.10161j.jinf.2021.05.022  available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8166461/.

research in Germany.[32] The researchers note: "The fact that we did not detect any laboratory-confirmed SARS-CoV-2 transmission from asymptomatic case-patients is in line with multiple studies . . ."[33] The lack of scientific and medical evidence surrounding asymptomatic spread led the researchers to conclude that asymptomatic spread is "unlikely to substantially spread COVID-19."[34]

70.     A review in March 2021 of all the published meta-analysis on asymptomatic transmission from Dr. John Lee, a retired British Professor of Pathology, reveals that in many cases, the same few studies have been recycled repeatedly to support the flawed proposition that those who are asymptomatic pose a real danger.[35] In the words of Allyson M. Pollock, a professor of public health at Newcastle University in the United Kingdom, "[s]earching for people who are asymptomatic yet infectious is like searching for needles that appear and reappear transiently in haystacks, particularly when rates are falling."[36]

71.     Moreover, according to FDA, there is insufficient data to determine the vaccines authorized for emergency use actually prevent asymptomatic infection or the transmission of SARS-CoV-2, the virus that causes Covid-19.[37]

---

[32] [32] Jennifer K. Bender, *Analysis of Asymptomatic and Presymptomatic Transmission in SARS-CoV-2 Outbreak, Germany, 2020,* 27 Emerging Infectious Diseases 4 (April 2021) available at https://www.cdc.gov/cid/article/27/4/20-4576_article.

[33] *Id.*

[34] *Id.*

[35] *See* John Lee, *Asymptomatic spread: who can really spread COVID-19,* Health advisory & Recovery Team (Mar. 2021) available at https://www.hartgroup.org/wp-content/uploads/2021/03/ASYMPTOMATIC-SPREAD.pdf.

[36] Allyson M. Pollock, *Asymptomatic transmission of covid-19,* the BMJ (Dec. 21, 2020) available at https://www.bmj.com/content/371/bmj.m4851.

[37] FDA, *Pfizer-BioNTech COVID-19 Vaccine Frequently Asked Questions,* (Nov. 19, 2020) available at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/pfizer-biontech-covid-19-vaccine-frequently-asked-questions.

72.     Additionally, the CDC reported that "scientific data" demonstrated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[38]

73.     In sum, little objective evidence exists to support a finding that asymptomatic spread is a driver of Covid-19 and, therefore, poses a danger to Defendant's workplace. Rather, the epidemic spread of Covid-19 is propelled almost exclusively by symptomatic persons (many of whom are fully vaccinated) who can easily self-isolate or quarantine from their co-workers.

74.     Evidence continues to come to light that further contradicts Defendant's claim that the vaccine requirement will reduce the spread of Covid-19. On October 11, 2022, Pfizer executive Janine Small admitted that their vaccine was never tested to determine if it was successful at reducing the spread of Covid-19 prior to it being introduced into the market. Yet Defendant justifies its mandatory vaccine policy by claiming, without any scientific support, that the vaccines will help protect others from the spread of Covid-19. [39]

75.     The government-operated Vaccine Adverse Event Reporting System ("VAERS") database is intended to function as an "early warning" system for potential health risks caused by vaccines. Presently, VAERS is broadcasting a red alert, but Defendant is refusing to take account this important data of adverse reactions to the vaccines and instead is barreling down the tracks of forced vaccination at full steam.

---

[38] *See CDC reversal on indoor masking prompts experts to ask, "Where's the data?",* WASHINGTON POST (Jul. 28, 2021) available at https://www.washingtonpost.com/health/breakthrough-infections-cdc-data/2021/07/28/dcaaa6b2-efce-11eb-a452-4da5fe48582d_story.html.

[39] https://lynnwoodtimes.com/2022/10/11/covid-transmission-221011/

76.     Recent data presents an alarming picture. As of October 7, 2022, there have been 31,470 deaths reported to VAERS from Covid-19 vaccines, compared to just 8,673 for the preceding 30 years for all other vaccines.[40] According to Josh Guetzhow, Ph.D., there are 91 times the number of deaths and 276 times the number of coagulopathy events reported after Covid-19 vaccination than after flue vaccination.[41]

77.     Moreover, new research suggests the heightened risk of adverse effects results from "preexisting immunity to SARS-CoV-2 [that] may trigger intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals

78.     Although the number of VAERS reports is alarming in its own right, it is likely the true number of adverse effects associated with the Covid-19 vaccines far exceeds cases reported to VAERS. In 2010, a federal study commissioned by the U.S. Health and Human Services and performed by Harvard University consultants on behalf of the Agency for Healthcare Research and Quality ("AHRQ") found that "fewer than 1% of vaccine adverse events" are ever reported to VAERS.[42] Thus, it is likely scores of adverse events associated with the Covid-19 vaccines, including deaths, go unreported.

79.     It is not just VAERS that is broadcasting a red alert. On October 1, 2021, the European Union's drug regulator, the European Medicines Agency ("EMA"), identified a new possible link between rare cases of blood clotting in deep veins with Johnson & Johnson's

---

[40] Josh Guetshow, *Safety Signals for COVID Vaccines are Loud and Clear. Why is Nobody Listening?* THE DEFENDER (Sept. 29, 2021) available at https://childrenshealthdefendse.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/.

[41] *Id.*

[42] Ross Lazerus, et al. *Electronic Support for Public Health – Vaccine Adverse Event Reporting System (ESP:VAERS),* Agency for Healthcare Research and Quality (Sept. 30, 2010) available at https://digital.ahrq.gov./sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf.

21

Covid-19 vaccine.[43] The EMA said the new, possibly life-threatening clotting condition known as venous thromboembolism ("VTE") should be included on the Johnson & Johnson product label as a possible side-effect of the shot.[44]

80.     What is more, the Moderna and Pfizer vaccines are made with polyethylene glycol (PEG) and Johnson & Johnson uses a similarly problematic ingredient: polysorbate.[45] PEG has been linked to anaphylaxis in numerous recipients of the vaccine. PEG is the delivery mechanism to the cells that keeps the mRNA from dispersing and not reaching its intended target. PEG performs its intended use. Unfortunately, about 70% of the U.S. population is slightly to somewhat allergic to PEG. The National Institute of Health (NHI) recently began a clinical trial of "systematic allergic reaction to the Moderna or Pfizer-BioNTech COVID-19 vaccines" due to the recipients of those vaccines experiencing anaphylaxis.[46]

81.     According to the CDC, individuals who are allergic to PEG should not take the Moderna or Pfizer vaccines, and those who are allergic to polysorbate should not take the Johnson & Johnson vaccine.[47]

---

[43] Reuters, EU finds J&J COVID shot possibly linked to another rare clotting condition, REUTERS (Oct. 1, 2021) available at https://www.reuters.com/business/healthcare-pharmaceuticals/eu-finds-jj-covid-shot-possibly-linked-another-rare-clotting-condition-2021-10-01/.
[44] *Id.*
[45] CDC, *COVID-19 Vaccines for People with Allergies* (Dec. 14, 2021) available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/specific-groups/allergies.html.

[46] NIH, *NIH begins study of allergic reactions to Moderna, Pfizer-BioNTech COVID-19 vaccines* (Apr. 7, 2021) available at https://www.nih.gov/news-events/news-releases/nih-begins-study-allergic-reactions-moderna-pfizer-biontech-covid-19-vaccines.
[47] *See id.* at note 43.

82.     Despite this known risk, Defendant did not offer PEG allergy testing pre-vaccination and are not offering any indemnity or disability coverage from any of the known and potential adverse effects of the Covid-19 vaccines.

83.     To summarize, the potential adverse effects Plaintiff faced in being coerced to receive the Covid-19 vaccines pursuant to Defendant's vaccine mandate is not theoretical, hypothetical or academic – they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the Covid-19 vaccines, subjecting Plaintiff to vaccination exposes them to a variety of health risks ranging from headaches and blood clots to death.

**Defendant improperly refused to grant Plaintiff's religious exemption in violation of Title VII and Section 344.040 of the Kentucky Revised Statutes**

A. Defendant's improper conduct regarding the vaccine mandate policy and procedures and its communications with Plaintiff regarding his request for a religious exemption.

84.     Defendant announced a universal mandatory Covid-19 vaccination policy on or about August 2, 2021 in order to significantly reduce of the spread of Covid-19 to their residents. (**Exhibit B**.) This claim fails on its face as the head of the CDC Rochelle Walensky stated on August 6, 2021, on CNN when referring to the Covid-19 vaccines ability to fight Covid-19 the vaccines: "...what they can't do anymore is prevent transmission."[48] This statement was made a mere four days after Defendant announced its vaccine policy and well before Plaintiff's employment was terminated. Defendant never updated its vaccine mandate policy between August 2, 2021, and Plaintiff's termination.

85.     In denying Plaintiff's religious exemption, Defendant claimed to have "followed CDC guidelines throughout the pandemic and have provided information about the facts of the

---

[48] https://edition.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-06-21/h_61de1502e86060f5faf4477339928e33

23

vaccines to ensure that our employees are not making their own personal decisions based on false information." **(Exhibit A.)** However, the CDC never provided guidance on how to evaluate a religious exemption. In fact, as stated above, the leader of the CDC stated prior to Plaintiff's termination that the Covid-19 vaccine did not stop transmission.

86.     The CDC has been roundly criticized for providing false information throughout the pandemic. These mistakes proved so pervasive that they have gone to the extraordinary step of publicly apologizing for said errors. Walensky is reported to have stated: "To be frank, we are responsible for some pretty dramatic, pretty public mistakes — from testing, to data, to communications." [49]

87.     For Defendant to rely on a CDC that has made such a stunning admission fails on two very important counts. One, the CDC did not have a grasp on the "facts" any better than many other medical organizations and/or individuals. Plaintiff, and all of Defendant's employees, have the fundamental right to make decisions based on their own understanding of factual scenarios. Second, the CDC's fundamental flaws in their understanding of anything is irrelevant when evaluating an individual's sincerely held religious beliefs.

88.     By Defendant not following federal guidelines, and instead substituting their own evaluation and threshold requirements to determine what is a valid religious accommodation request under Title VII, as a replacement for of the appropriate evaluation as documented throughout this complaint, they violated the very federal governmental guidelines they used to justify terminating Plaintiff's employment.

---

[49] https://nypost.com/2022/08/17/cdc-to-get-shake-up-after-covid-response-mistakes/

89.     Upon information and belief, Defendant never planned to follow federal or state law requirements, discussed *infra*, that reasonable accommodations must be made for the religious observances of its employees, short of undue hardship.

90.     Upon information and belief, Defendant denied all requests for religious accommodations.

91.     Plaintiff objects to receiving the Covid-19 vaccine(s) because he is a Christian, his body is the temple of the Holy Spirit and, as a Christian, he is compelled to protect his body from defilement. Insofar as the Covid-19 were in part developed using aborted fetal cells, Plaintiff finds the taking of the vaccine to be in direct conflict with his Christian duty to protect his body as the temple of the Holy Spirit.

B. <u>Federal law and State law prohibiting religious discrimination.</u>

92.     Title VII prohibits Defendant from discriminating against employees based on their religion. This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

93.     Title VII "imposes upon employers a 'statutory obligation to make reasonable accommodation for the religious observances of its employees, short of undue hardship." *Reed v. International Union, United Automobile, Aerospace and Agricultural Implement w\Workers of America*, 569 F.3d 576, 579 (6th Cir. 2009).

*94.*     A prima facie case of religious discrimination based on a failure to accommodate requires a plaintiff to show "(1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the [defendant's] attention, and (3) the

religious practice was the basis for the adverse employment decision." *E.E.O.C. v. Union Independiente de la Autoridad de Acuductos y Alcantarillados de Puerto Rica*, 279 F.3d 49, 55 (1st Cir. 2002). *See also Reed,* 569 F. 3d at 579 (6th Cir. 2009); *Smith v. Pyro Mining Co.,* 827 F.2d 1081 (6th Cir. 1987) A "bona fide religious practice" or belief is one that is "religious and sincerely held." *Id.* Title VII's definition of religion includes "all aspects of religious observance and practice, as well as belief." *Id.,* citing 42 U.S.C. § 2000e(j). Further 29 C.F.R. § 1605.1 states that religious practices include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious values." Section 2000e(j) "leaves little room for a party to challenge the religious nature of an employee's professed beliefs." *Union Independiente*. Religious beliefs are not required to be "acceptable, logical, consistent, or comprehensible to others," and that interfaith differences as to what is scripturally acceptable are "not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences." *Id.*

95. This complaint has meticulously met the above elements.

96. Once an employee has made out a prima facie case of discrimination, the employer must show that it offered a reasonable accommodation, or that reasonable accommodation would be an undue burden.

97. Defendant provided a conclusory statement, without any support, that Plaintiff's exemption requests failed to meet "the criteria for an exemption from our universal vaccine policy." **(Exhibit A.)** Defendant did not claim that providing Plaintiff a religious exemption would be an undue burden. Therefore, Defendant should be barred from asserting that claim after the fact of Plaintiff's termination from employment.

26

98.     *Arguendo,* if Defendant attempted to claim an undue burden, it would fail as a matter of law as it cannot carry the requirement to make such a defense. "An employer must . . . present evidence of undue hardship" and not "rely merely on speculation," *Smith v. Pyro Min. Co.,* 827 F.2d 1081, 1085-86 (6th Cir. 1987). In this case, the lack of substantive content in Defendant's justification demonstrates that Defendant failed to show undue hardship.

99.     Undue hardship analysis must start with an analysis of proposed accommodations. Defendant did not identify potential accommodations. Therefore, Defendant did not reach the first step of analyzing accommodations. An employer violates Title VII if it fails to attempt as accommodation after accommodation is requested. *EEOC v. Arlington Transit Mix, Inc.,* 957 F.2d 219, 222 (6th Cir. 1991) ("[a]fter failing to pursue [a voluntary waiver of seniority rights] or any other reasonable accommodation, the company is in no position to argue that is was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship."); *EEOC v. Ithaca Indus., Inc.,* 849 F.2d 116 (4th Cir. 1988) *cert denied* 488 U.S. 924 (1988) (same).

100.     An employer must demonstrate attempted accommodation before it claims undue hardship as a defense. *See, e.g., Redmond v. GAF Corp.,* 574 F.2d 897, 901-02 (7th Cir. 1978); *Shaffeld v. Northrop Worldwide Aircraft Serv., Inc.,* 373 F. Supp. 937, 944 (M.D. Ala. 1974). Defendant's' justification for denying Plaintiff's requests for religious exemptions demonstrates that it did not consider potential accommodations.

101.     Moreover, Defendant clearly could have considered accommodations as dictated by the EEOC. The EEOC Covid-19 guidelines provide "examples of reasonable accommodations or modifications that employers may have to provide to employees who do not get vaccinated due to disability; religious beliefs, practices, or observance; or pregnancy." Reasonable accommodations the EEOC has identified as potentially not imposing an undue

27

hardship on the employer include requiring the unvaccinated employee entering the workplace to:

(1) wear a face mask,

(2) work at a social distance,

(3) work a modified shift.

(4) get periodic tests for COVID-19,

(5) be given the opportunity to telework, or

(6) accept a reassignment.

*See* EEOC Covid-19 Guidance, K.2.

102. Plaintiff would have willingly complied with any of these accommodations.

103. Beginning in March 2020, Defendant had the opportunity to test many relevant accommodations for its employees, including daily assessments of personal health and potential exposure, availability of targeted Covid-19 testing, protocols requiring non-work when symptomatic or potentially exposed to Covid-19, contact tracing, handwashing and hygiene, and the use of PPE.

104. Such accommodations are understood to have prevented any substantial or material transmission of Covid-19 when used.

105. In addition, other accommodations are potentially available. For instance, the EEOC has specifically identified testing of employees before they enter the workplace. The EEOC Covid-19 Guidance states, "an employer may choose to administer COVID-19 testing to employees before initially permitting them to enter the workplace and/or periodically to determine if their presence in the workplace poses a direct threat to others." *EEOC COVID-19 Guidance*, A.6.

28

106.    Defendant's vaccine mandate provided employees the illusory ability to obtain a religious exemption from the vaccine mandate.

107.    Defendant denied Plaintiff's request for religious accommodation with the claiming that Plaintiff did not meet some undefined "criteria." **(Exhibit A.)**

108.    Considering the inexact and conclusory words of Defendant, there is no way to determine whether Plaintiff's beliefs were determined to not be religious in nature, nor sincerely held, or some other Defendant generated evaluation. However, what we do know is that a fair reading of his exemption request easily meets the sincerely held religious beliefs standard under the federal law as defined by the EEOC and federal and state law as quoted above.

109.    Defendant made no attempt to accommodate Plaintiff's request for religious exemption, even though he was willing to comply with other safety precautions.

110.    Defendant made no showing, nor ever even attempted to support, that providing Plaintiff the requested exemption was an undue burden.

111.    Defendant did not engage Plaintiff in a give and take discussion about potential accommodations. Plaintiff's willingness to comply with other safety measures were ignored.

112.    In Kentucky, K.R.S. § 344.040 "mirrors Title VII of the Civil Rights Act of 1964" and, therefore, all the courts applying it, both state and federal, literally "use the federal standards for evaluating race discrimination claims." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000).

113.    Given these facts, Defendant's vaccination policy is vastly overreaching and unnecessarily violated federal and state law.

## COUNTS

### COUNT ONE

**Violation of Title VII, 42 U.S.C. § 2000e,** *et seq.*
**Religious Discrimination-Failure to Accommodate**

114.    Plaintiff restates the foregoing paragraphs as if set forth fully herein.

115.    At all times relevant, Plaintiff was Defendant's "employee" within the meaning of 42 U.S.C. § 2000e(f).

116.    At all times relevant, Defendant was Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e(b).

117.    Plaintiff holds sincere religious beliefs that preclude his from receiving a Covid-19 vaccine.

118.    Plaintiff informed his employer, Defendant, of those beliefs and requested religious accommodations from Defendant's vaccine mandate.

119.    Defendant refused to engage in a meaningful interactive process with Plaintiff regarding his religious accommodation request and instead only responded to Plaintiff with unsupported legal findings and zero undue burden claims. Defendant failed to provide Plaintiff with reasonable accommodations for his religious belief, instead terminating him for failing to violate his sincerely held beliefs and obtain vaccination.

120.    Defendant thereby discriminated against Plaintiff because of his religious beliefs.

121.    By failing to engage in the interactive process or offer any reasonable accommodation, Defendant's discriminatory actions were intentional and/or reckless and in violation of Title VII.

30

122.    It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because Defendant intended to discriminate against those seeking religious exemptions and never intended to provide them with a reasonable accommodation.

123.    Defendant illegally and improperly did not identify potential accommodations as required by state and federal law. Defendant cannot assert the defense of undue hardship because it did not carry the burden required to do so. And *arguendo*, Plaintiff effectively rebuts any claim of undue burden above.

124.    By discriminating against Plaintiff because of his sincerely held religious beliefs, in its decision to deny Plaintiff's legitimate religious exemptions, Defendant violated Title VII and this violation has harmed and continues to harm Plaintiff.

125.    Due to Defendant's improper, willful, intentional, and unlawful actions, and the subsequent harm suffered by Plaintiff, Plaintiff asks the Court for the relief requested in his Prayer for Relief.

## COUNT TWO

### Violation of K.R.S. § 344.040, *et seq.,*
### Religious Discrimination-Failure to Accommodate

126.    Plaintiff restates the foregoing paragraphs as if set forth fully herein.

127.    Plaintiff holds sincere religious beliefs that preclude him from receiving a Covid-19 vaccine.

128.    Plaintiff informed his employer, Defendant, of those beliefs and requested religious accommodations from Defendant's vaccine mandate.

129.    Defendant refused to engage in a meaningful interactive process with Plaintiff regarding his religious accommodation request and instead only responded to Plaintiff with

31

unsupported legal findings. Defendant failed to provide Plaintiff with reasonable accommodations for his religious belief, instead terminating him for failing to violate his sincerely held beliefs and obtain a vaccination.

130. Defendant thereby discriminated again Plaintiff because of his religious beliefs.

131. By failing to engage in the interactive process and not offering any reasonable accommodation, Defendant's discriminatory actions were intentional and/or reckless and in violation of K.R.S. § 344.040, *et seq.*

132. It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because Defendant intended to discriminate against those seeking religious exemptions and never intended to provide them with a reasonable accommodation.

133. Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. Defendant cannot assert the defense of undue hardship because it did not assert or show undue hardship in declining to accommodate Plaintiff's sincerely held religious beliefs and no undue burden exists here regardless.

134. By discriminating against Plaintiff, because of his sincerely held religious beliefs, in its decision to deny Plaintiff's legitimate religious exemption, Defendant violated K.R.S. § 344.040, *et seq.*, and this violation has harmed and continues to harm Plaintiff.

135. Due to Defendant's improper and willful, intentional and unlawful actions, conducted with malice and aggregated and egregious fraud, and the subsequent harm suffered by Plaintiff, Plaintiff asks the Court for the relief requested in his Prayer for Relief.

**PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

A.      Payment for all economic damages, including, but not limited to, back pay, front pay and benefit in amounts to be determined at trial;

B.      Compensatory and consequential damages, and all non-economic damages, including for emotional duress;

C.      Punitive damages;

D.      Statutory damages;

E.      Pre-judgment and post-judgment interest at the highest lawful rate;

F.      An award of reasonable attorneys' fees, costs and expenses of all litigation to the extent allowable under federal and state law;

G.      Trial by jury on all triable issues, and;

H.      Such other relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

/s/___Melissa Hammond___
Melissa Hammond (#86054)
Deters Law
5247 Madison Pike
Independence, KY 41051
Phone: (859) 363-1900
Fax: (859) 363-1444
mhammond@ericdeters.com

33

34